The chief complaint of appellants is that the court erred in denying a new trial based upon the ground of newly discovered evidence. To better understand the ruling of the court, a brief statement of the facts will be helpful.
The plaintiff is an unmarried laboring man, 72 years old at the time of the trial, who had lived about the town of Dows and worked at common labor for over 20 years. He had acquired a modest amount of property. From 1929 to 1936 he had made his home with the defendant, R.H. Meyer, commonly called Roman Meyer. During all, or the greater portion of this time, Meyer lived on a 40-acre tract partly within the corporate limits of the town. The plaintiff received no wages and paid no board. He milked the cows, fed the chickens, cut wood, fixed fences, and did the chores generally about the place. He occasionally received modest honorariums from Meyer, by way of vacation and business trips, at the expense of the latter.
The defendant Meyer Meyer was a partnership, composed of R.H. Meyer and his nephew, Byron Meyer, and was engaged in buying livestock. The firm, or Roman Meyer, also conducted a sales barn. When the banks were closed in early March, 1933, Roman Meyer told the plaintiff that the firm was in need of cash, but had had proffers of help. The plaintiff told him that he had lately withdrawn $2,000 from a Spirit Lake Bank, and had it in paper currency, and if it would aid the firm he would loan the money to it. The offer was accepted, and the firm through R.H. Meyer, executed its note of $2,000 to the plaintiff, on March 4, 1933, payable 10 days later. After the bank had reopened, and on March 28, 1933, Roman Meyer claimed that he withdrew $2,000 and the accrued interest on the note, in cash, from the firm's bank account, and tendered the money to plaintiff, with the statement, that the firm no longer needed the money. He testified that plaintiff rather demurred *Page 514 
to accepting the money, and inquired if the firm could not use it for a longer time. Roman said he told him that the firm did not need it, but that he, personally, could use the money in making a payment on the 40 acres, which he had bought in February, 1933, but that if this was done the firm note would have to be canceled and returned, and his own individual note substituted therefor. He testified that the plaintiff accepted the proposition, and told him he would look up and return the firm note, and that it could be considered as canceled and the firm debt discharged. Roman Meyer further testified that about a year later he told plaintiff that he still had his money, and that he was going to pay it on the purchase price of the farm, or to reduce a mortgage indebtedness thereon, if plaintiff had no objection. He stated that plaintiff said he had no objection and for him to so use the money. Defendants pleaded this alleged payment of the note as a defense to the suit. Meyer said that on several occasions, after the alleged arrangement with plaintiff, he asked for the return of the firm note, and offered to execute his note. Of these occasions, he testified:
"I had other conversations with him after that time. I kept a record of these conversations in an individual account book but the account book has been destroyed. I asked him several times to get the note for me, that I would like to straighten it up, but he never answered me. He would always walk away, except the first time, and at that time, he said it was all right. I made an entry every time I had a talk with him about the $2,000. * * * I had other conversations with Mr. Larson on two different occasions. When I asked him to look up the note, that I wanted to get it straightened out; then again in 1936 in the Fall, I told him things weren't looking good for me, that I didn't want him to lose the money, that I would turn the property over to him, so that he would not lose his money. I offered to deed my equity to him. He said `I don't want the land, I want the money.' I said. `I haven't got the money and things don't look so good, and it might take quite a while to get it, and I would rather do it that way to protect you.' He made no answer."
He testified that on one occasion the plaintiff said he had lost or mislaid the note.
The plaintiff denied each and all of the above-stated *Page 515 
transactions, which occurred subsequent to the execution of the note. He testified that Roman Meyer never mentioned the note to him until in August, 1936, when he asked to substitute his note for the firm note, and plaintiff refused. He testified that Roman Meyer never tendered payment of the note, or offered to deed him property, or to secure him in any way, at any time. He stated that the transaction was handled, for the firm, entirely by Roman Meyer, and that he never talked to Byron Meyer about it until after the action was brought.
The plaintiff, alone, testified in support of his case, and offered the note sued on in evidence. The testimony of Roman Meyer was supported by the testimony of Fred M. Bump, a former employee of his, and by that of Mrs. Bump. They testified to separate occasions when plaintiff allegedly made admissions damaging to his cause. Bump stated that, about October 1, 1936, the plaintiff told him:
"He told me Roman owed him this money and he had nothing to show for it, that Roman wanted to sign the property over but he said he didn't want the property, he wanted money. I said to him, `Hans, you better take it. You better take the property. There is a small mortgage of $1500 against it.' * * * I had another conversation with him one evening when he came over to our place to fetch back some jars the missus had given him fruit in. Hans said he was left with no money, Roman had left him owing this money, and the stockyard money, and he put it in the farm and now he didn't have nothing to show for it. My wife was present at the conversation, just we three. * * * I asked Mr. Larson whether Byron Meyer or Meyer Meyer owed him anything. He told me that the money, that $2,000 was put in the farm, he let Roman have it. He told me that he let Roman have it to put in the farm, that Roman wanted to sign the property back to him, that he had nothing to show for it. He said Byron didn't owe anything. It was Roman that owed him the money."
Of the latter occasion, late in the fall of 1936, Mrs. Bump testified:
"One evening Hans Larson spoke about the $2,000 loan. He said Mr. Roman Meyer owed him $2,000. He said that Byron had had it, that he could have had it at one time, that Roman *Page 516 
came home and said to him that Byron had paid that money and what did he want to do with it. He said the bank wasn't good and he didn't feel like keeping it around. That Roman said to him, if you don't want it and don't want to use it, and want to let me have it, I will pay off the mortgage on the farm and he said, `I thought Roman was all right and if he wanted it, I could get it, that that was a good place for it.' So, he says, `I let Roman have it and now it looks like I ain't going to get it. It is gone.' He said he thought that as long as Roman was there, he would get it when he needed it, but now it looks like it was gone and it left him hard up."
The jury evidently thought the testimony of the plaintiff was more worthy of belief than that offered by the defendants, as they returned a verdict of $3,250 for him.
In their motion for new trial the defendants claimed newly discovered evidence, and attached the affidavits of three persons who each swore that on separate occasions admissions against his interest were made by appellee. One affiant stated that between July 1 and October 1, 1934, plaintiff told him he had loaned Roman Meyer $2,000 to make a payment on his 40-acre farm, and that he had no note to evidence the loan. Another swore that between September 1, 1936, and January 1, 1937, plaintiff told him Roman Meyer owed him a large sum of money, and the latter asked him to take over the 40-acre farm, and that he refused, but wished later he had accepted. The third affiant stated that in October or November of 1937 the plaintiff told him that he invested $2,000 in the 40-acre farm owned by Roman Meyer. This person had talked to Byron Meyer before the trial but this matter was not discussed. No question was raised as to the diligence of appellants.
In its ruling the trial court stated:
"I am of the opinion after examining the three affidavits setting forth the newly discovered evidence, that such evidence, if given, is not of such weight and effect as to be at all likely to produce a different result if a new trial is had. Nearly every circumstance set forth in these affidavits was testified to, in substance, at least, by the two witnesses, Mr. and Mrs. Bump, both of whom were disinterested witnesses. Their testimony, however, was much stronger and very more directly to the point in controversy than the evidence set forth in these affidavits. * * * *Page 517 
"I am reluctant about granting a new trial in any case unless it is clearly shown that an error has been committed and an injustice will result. I am of the opinion that the showing made and the reasons urged in this case are insufficient to warrant the Court in setting aside this verdict and granting a new trial."
[1] I. The motion for new trial was filed under 1935 Code, section 11550, paragraph 7, which provides:
"The former report, verdict, or decision, * * * shall be vacated and a new trial granted, * * * for the following causesaffecting materially the substantial rights of such party: * * *
"7. Newly discovered evidence, material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial."
The italicized words furnish the interpretive key to the section. As stated in Dobberstein v. Emmet County, 176 Iowa 96,103, 155 N.W. 815:
"* * * the court will grant the rehearing much more readily than where the evidence leaves little room for doubt that the judgment as rendered effectuates justice."
Were the substantial rights of the appellants materially affected by being denied a new trial of the issues, with the additional testimony? The test has been repeatedly stated by this court in language, sometimes differently worded, but uniformly of the same import. In Rockwell v. Ketchum, 149 Iowa 507, 517, 518,128 N.W. 940, the court stated it thus:
"It [new trial] ought not to be granted unless the newly discovered evidence is such as likely will lead to a different result. * * * or in any case where a different result is not reasonably probable."
In Walterick v. Hamilton, 179 Iowa 607, 161 N.W. 684, the phrase last quoted was used. In Simons v. Harris, 215 Iowa 479,482, 245 N.W. 875, this language was used:
"The overruling of such motion on the ground of newly discovered evidence is a matter that primarily rests in the sound discretion of the trial court, and should not be granted unless *Page 518 
the newly discovered evidence will probably lead to a differentresult." (Italics ours.)
In Henderson v. Edwards, 191 Iowa 871, 873, 183 N.W. 583, we said:
"If it can be said that, in all probability, the newly discovered evidence will not affect the result in case of a second trial, then the motion should be denied."
In the last cited case, this language also is found:
"If the proffered evidence presents material facts germane to the issue in controversy, which, considered with the evidence presented on the trial, might cause a jury to take the other view, then the motion should be sustained." (Italics ours.)
We think the word "might" states the rule too broadly. The question is not one of possibility, but rather one of reasonable probability, or likelihood. See also City of Des Moines v. Frisk,176 Iowa 702, 158 N.W. 590.
In Harber v. Sexton Son, 66 Iowa 211, 216, 23 N.W. 635, 637, the court said:
"* * * we do not think that the alleged newly-discovered evidence, if admitted upon another trial, would change the result. * * * In our opinion, the introduction of the alleged newly-discovered evidence could have but little weight, and would not have led to a different result."
[2] II. Further support for the court's ruling is the fact that the new evidence is clearly cumulative. Not cumulative, as to the incident and occasion, testified to by Mr. and Mrs. Bump, but cumulative as to the point or issue concerning which they testified. In German v. The Maquoketa Savings Bank, 38 Iowa 368,369, the court stated:
"It is exceedingly difficult, if not impossible, to furnish a general definition of cumulative evidence, which in a given case will materially aid in determining whether particular testimony offered falls within or without that class.
"In 1 Greenleaf on Evidence, § 2, it is said: `Cumulative evidence is evidence of the same kind, to the same point. Thus,if a fact is attempted to be proved by the verbal admission of *Page 519 the party, evidence of another admission of the same fact iscumulative.'" (Italics ours.)
The rule from Greenleaf was again followed in Wayt v. B., C.R. M.R. Co., 45 Iowa 217, 220.
The illustration given by Greenleaf exactly parallels the situation in this case. Here the Bumps testified to two separate occasions when the plaintiff allegedly admitted that it was Roman Meyer who was indebted to him, while the affiants swear to other admissions of the same fact. Their testimony, if it would be as alleged, would unquestionably be cumulative. The fact that each of the affiants described a different transaction from that testified to by the Bumps, would not save their testimony from being cumulative. In so far as Means Bros. v. Yeager, 96 Iowa 694,697, 65 N.W. 993, may hold to the contrary it is overruled.
[3] III. In a matter of this kind a large discretion is lodged in the trial court. The trial judge by his long experience at the bar and on the bench was eminently qualified to pass upon this question, and it is our judgment that he exercised his discretion wisely and judiciously. He had the witnesses before him, he could observe the reaction of the jury to their testimony, and was in a better position to judge of what another jury might do than we are able to do. As stated in Alger v. Merritt, 16 Iowa 121, 127:
"It is always difficult for the appellate tribunal to more than approximate to a knowledge of the facts as they actually occurred at the trial. The judge at nisi prius has a much better opportunity for seeing and judging how the testimony given and that afterward discovered bears upon that issue, to determine whether the facts offered are similar or dissimilar."
Appellants' counsel has ably presented this case, and it is conceded that he was diligent in his investigation of the facts, but every trial lawyer knows that after the trial of any case that has been provocative of publicity, information very often comes to the attorneys or parties, on both sides, of evidence which would have been material and perhaps helpful. The missed opportunity is but one of the fortunes of legal warfare, but it is not necessarily a ground for relitigating the issues.
We have carefully examined all other assignments and find *Page 520 
no errors therein. The judgment of the trial court is therefore affirmed. — Affirmed.
OLIVER, C.J., and HALE, RICHARDS, SAGER, HAMILTON, STIGER, MITCHELL, and MILLER, JJ., concur.